**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

UNITED STATES OF AMERICA      :
                              :
             v.               :        CASE NO.: CR208-09
                              :
ROBERT ANTONIO HOWARD         :

## O R D E R

Defendant Robert Antonio Howard ("Defendant") has been charged with driving under the influence of alcohol, in violation of 18 U.S.C. §§ 7 and 13 and O.C.G.A. § 40-6-391(a)(5), and possession of an open alcoholic container, in violation of O.C.G.A. § 40-6-253. Defendant filed a Motion to Suppress, to which the Government responded. Defendant filed a Reply. The undersigned conducted an evidentiary hearing on July 29, 2008, at which Officer Jeanne Tucker, Sergeant Rodger Wisdom, and Michael Bustamante testified.

## FINDINGS OF FACT

The credible testimony at the evidentiary hearing established the following:

On February 2, 2008, Officer Jeanne Tucker ("Tucker"), the watch commander, instituted a Selective Traffic Enforcement Program ("STEP") inspection site at Naval Submarine Base Kings Bay, Georgia, based on standing orders from the Base Commander to continue these inspections, which had been on-going for about one (1) year. The STEP inspection required that every vehicle entering the base at this

particular checkpoint be stopped, and the drivers of these vehicles were asked to provide their licenses, proof of insurance, and registrations. Tucker testified that drivers were required to have this documentation according to Georgia law. Security personnel were also directed to determine whether drivers exhibited signs of intoxication. Tucker testified that an inspection in which everything is correct will take no more than 30 seconds, on average. Tucker stated that there was no signage posted announcing the inspection, but one of the security contractor's vehicles was at the entrance of the Base and had an orange, swirling light activated, that several security personnel were wearing brightly colored vests, and that drivers were being directed into the inspection site. Upon approaching Defendant's vehicle, Tucker noticed a smell commonly associated with the smell of alcohol coming from Defendant's vehicle. Tucker also noticed a bottle of Bud Light, which was half full and still had condensation on it, in Defendant's car. Tucker testified that she could still smell an alcohol odor after Defendant got out of his vehicle. Tucker also testified that she turned Defendant over to Sergeant Rodger Wisdom ("Wisdom") for an investigation as to whether Defendant had been driving under the influence of alcohol, as Wisdom was the only other person at the STEP inspection site with training in detecting whether someone had been driving under the influence.

Wisdom stated he could smell the odor of alcohol coming from Defendant after he got out of his car and that he could tell Defendant's eyes were red. Wisdom testified that he asks people who he suspects have been driving under the influence if they have any medical condition which would render them unable to perform any of the field sobriety tests; Defendant apparently indicated he did not have any such medical

condition. During the horizontal gaze nystagmus test, Wisdom stated Defendant lacked smooth pursuit of the stimulus (the tip of a pen) and showed nystagmus, or involuntary jerking, at maximum deviation and prior to 45 degrees. Defendant lost his balance, raised his arms more than six (6) inches from his body to maintain his balance, did not walk heel to toe as instructed, and did not stay on the line during the walk-and-turn test. Wisdom stated that, during the one leg stand test, Defendant lost his balance and put his foot down on count 4. Wisdom had Defendant start again, and Defendant put his foot down on count 5. Wisdom testified that he stopped the test for Defendant's safety. Defendant agreed to submit to a preliminary breath test, but Defendant did not provide a sufficient breath sample, as he did not make a complete seal on the breath tube. Based on the results of the field sobriety tests and the preliminary breath test, Wisdom placed Defendant under arrest, read him the Georgia Implied Consent notice, and transported him to security headquarters.

While Defendant was at security headquarters, Michael Bustamante ("Bustamante") performed two (2) tests of Defendant's breath using the Intoxilyzer 5000 after Defendant had been observed for 20 minutes. Bustamante testified that Defendant's first breath sample registered 0.145 as his blood alcohol concentration level, and his second sample registered a blood alcohol concentration level of 0.143.

## ISSUES PRESENTED

Defendant asserts any evidence obtained as a result of the roadblock should be suppressed because the roadblock was an unreasonable and unlawful seizure under the Fourth Amendment. Defendant contends that all evidence relating to any chemical or sobriety tests he was administered should be inadmissible at trial because he was

not advised of the Georgia Implied Consent Notice at the time of his arrest, nor was he advised of his <u>Miranda</u> rights or given the Implied Consent Notice prior to submitting to the field sobriety tests.

## DISCUSSION AND CITATION TO AUTHORITY

I.  **Roadblock/Fourth Amendment**

Defendant asserts the gate through which he entered the Base was open to the public, which creates a distinction between a "closed" base, and that he, as a member of the military, had reason to believe he could drive through the open portion of the Base without being subjected to an unreasonable seizure.  Defendant contends the very broad purpose the Government advanced as the reason for the roadblock is akin to the general crime control purpose the United States Supreme Court found invalid in <u>City of Indianapolis v. Edmond</u>, 531 U.S. 32, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000). Defendant alleges that, for a roadblock seizure to be valid, "it must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." (Doc. 19, p. 6).  Defendant also alleges the Government has failed to provide details of the plan under which the stop was made, which makes the stop presumptively invalid.

The Government contends that, while the particular portion of the Base where Defendant was stopped is not completely closed to the public, it is federal property over which the Commanding Officer has jurisdiction and a security interest.  The Government also contends the Commanding Officer has the authority to issue restrictions on the right of access to the base.  The Government avers the Commanding Officer authorized the operation of the STEP inspection site "to ensure the safety, morale, welfare, and

good order and discipline of both military personnel and civilians. The Commanding Officer is endowed with the authority to ensure that drivers on his base wear seatbelts and are properly licensed." (Doc. No. 17, p. 6). The Government asserts Defendant consented to be stopped and searched when he entered the Base based on the existence of fences, signage indicating that the Base belongs to the United States Government and is under control of the Commanding Officer, and the Defendant's "common sense awareness of the nature of a military base[.]" (Id. at 7). The Government also asserts Defendant incorrectly bases his argument using a roadblock analysis, which is inapplicable since Defendant was arrested on a naval base.

Vehicle stops at roadway checkpoints constitute a seizure within the meaning of the Fourth Amendment. Edmond, 531 U.S. at 40, 121 S. Ct. at 453. "The Fourth Amendment imposes limits on search-and-seizure powers in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals. In delineating the constitutional safeguards applicable in particular contexts, the Court has weighed the public interest against the Fourth Amendment interest of the individual[.]" United States v. Martinez-Fuerte, 428 U.S. 543, 554-55, 96 S. Ct. 3074, 3081, 49 L. Ed. 2d 1116 (1976); see also Michigan Dept. of State Police v. Sitz, 496 U.S. 444, 455, 110 S. Ct. 2481, 2488, 110 L. Ed. 2d 412 (1990) (finding sobriety checkpoints valid given the "balance of the State's interest in preventing drunken driving, the extent to which this system can reasonably said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped[.]"); United States v. Prevo, 435 F.3d 1343, 1345 (11th Cir. 2006) (the Fourth Amendment test "is reasonableness in light of all the circumstances."). "The

regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest." Martinez-Fuerte, 428 U.S. at 559, 96 S. Ct. at 3083. "[S]tops for brief questioning routinely conducted at permanent checkpoints are consistent with the Fourth Amendment and need not be authorized by warrant." Id. at 566, 96 S. Ct. at 3087. The Eleventh Circuit Court of Appeals has adopted "a totally objective rule: a state may conduct a mixed-motive roadblock as long as one purpose presented for the roadblock could validly justify the roadblock, even if no roadblock would have been put in place but for the state's desire to hunt" for illegal activities. See Merrett v. Moore, 58 F.3d 1547, 1550-51 (11th Cir. 1995). "To be valid a checkpoint, then, must reach beyond general crime control—either targeting a special problem such as border security[1] or a problem peculiar to the dangers presented by vehicles."[2] United States v. Green, 293 F.3d 855, 858 (5th Cir. 2002). Moreover, "[d]eference must be granted to military commanders to allow them to maintain security in a base, even if that base is open." United States v. Ellis, 15 F. Supp. 2d 1025, 1029 (D. Colo. 1998) (citing Romo v. Champion, 46 F.3d 1013 (10th Cir. 1995)).

Contrary to Defendant's assertion, the roadblock at issue in this case is more akin to the facts of Sitz rather than those in Edmond. In Edmond, the Supreme Court held that a highway checkpoint program established by the City of Indianapolis for the primary purpose of interdicting illegal narcotics violated the Fourth Amendment because it resulted in seizures that were not based upon individualized reasonable suspicion, a necessary component of any stop whose chief purpose is "to detect evidence of

---

[1] See Martinez-Fuerte, 428 U.S. at 566, 96 S. Ct. at 3087.

[2] See Sitz, 496 U.S. at 455, 110 S. Ct. at 2488.

ordinary criminal wrongdoing." Edmond, 531 U.S. at 41, 121 S. Ct. at 454. The Supreme Court noted that what principally distinguished the types of checkpoints that it had approved in earlier cases was the primary purpose of those checkpoints, which were each designed to serve an important governmental interest other than general crime control, such as policing the border or ensuing roadway safety. Id. at 41-42, 121 S. Ct. at 454. In ruling that suspicionless checkpoint stops are constitutional only if their primary purpose is separate from the general interest in crime control, the Supreme Court explicitly commented that its holding did "nothing to alter the constitutional status of the sobriety and border checkpoints" which were approved "in Sitz and Martinez-Fuerte[.]" Id. at 47, 121 S. Ct. at 457. In Sitz, the Supreme Court determined the harms involved in traffic situations, such as drunk driving, greatly outweighed the "measure of the intrusion on motorists stopped briefly at sobriety checkpoints[.]" Sitz, 496 U.S. at 451, 110 S. Ct. at 2486. The Supreme Court found that the sobriety checkpoints within the State of Michigan were consistent with the Fourth Amendment. Id. at 455, 110 S. Ct. at 2488.

Though the Government has not offered any documentary evidence in support of the STEP inspection site, the uncontroverted testimony at the evidentiary hearing provides ample support for the constitutional validity of the STEP inspection site. Even though Officer Tucker was the watch commander at the inspection site on the night in question and ordered the specific roadblock, she did so upon the standing orders of the Base Commander. In addition, there was no unfettered discretion at use by Tucker, as every vehicle attempting entry upon the Base at this particular location was stopped and directed to pull over to the inspection site. The purpose of the inspection was to ensure

the drivers were properly licensed and seat belted and to determine whether a driver was under the influence of alcohol to the extent it made them unsafe drivers. Tucker testified that the stops lasted no more than thirty (30) seconds, on average, if all things appeared to be in proper order. Moreover, despite the lack of signage announcing the inspection, there was a police-type vehicle at the Base's entry with its lights on, and security personnel were wearing brightly colored vests. Further, Defendant was attempting entry onto a military installation. Even if the gate through which he attempted entry was not on a "closed" part of the Base, this Court must nonetheless respect the security needs inherent of a military installation. The STEP inspection site roadblock in this case reasonably fits within the constraints of the Fourth Amendment.

## II. Implied Consent/Miranda Warnings

Defendant asserts a suspect is required to be given certain warnings before a chemical test is performed, which are designed to inform a suspect of his rights and the consequences of his actions prior to submitting to any testing. The Government alleges 18 U.S.C. § 3118, the federal implied consent statute, sets forth the procedural requirements for chemical testing in cases such as this one, not Georgia law.

### A. Implied Consent

The Georgia Implied Consent Notice for Suspects over 21 provides:

Georgia law requires you to submit to state administered chemical tests[3] of your blood, breath, urine, or other bodily substances for the purpose of determining if you are under the influence of alcohol or drugs. If you refuse this testing, your Georgia driver's license or privilege to drive on the highways of this state will be suspended for a minimum period of one year.

---

[3] O.C.G.A § 40-5-67.1(a) provides, in relevant part, that: "The test or tests required under Code Section 40-5-55 shall be administered as soon as possible at the request of a law enforcement officer having reasonable grounds to believe that the person has been driving or was in actual physical control of a moving motor vehicle upon the highways or elsewhere throughout this state in violation of Code Section 40-6-391 and the officer has arrested such person for a violation of Code Section 40-6-391[.]"

Your refusal to submit to the required testing may be offered into evidence against you at trial. If you submit to testing and the results indicate an alcohol concentration of 0.08 grams or more, your Georgia driver's license or privilege to drive on the highways of this state may be suspended for a minimum period of one year. After first submitting to the required state tests, you are entitled to additional chemical tests of your blood, breath, urine, or other bodily substances at your own expense and from qualified personnel of your own choosing. Will you submit to the state administered chemical tests of your (designate which tests) under the implied consent law?

O.C.G.A. § 40-5-67.1(b)(2). The federal implied consent statute provides:

Whoever operates a motor vehicle in the special maritime and territorial jurisdiction of the United States consents thereby to a chemical test or tests of such person's blood, breath, or urine, if arrested for any offense arising from such person's driving while under the influence of a drug or alcohol in such jurisdiction. The test or tests shall be administered upon the request of a police officer having reasonable grounds to believe the person arrested to have been driving a motor vehicle upon the special maritime and territorial jurisdiction of the United States while under the influence of drugs or alcohol in violation of the laws of a State, territory, possession, or district.

18 U.S.C. § 3118.

The evidence before the Court reveals Wisdom read Defendant his Georgia Implied Consent Notice for Suspects over the age of 21. Wisdom did so upon arresting Defendant for his alleged violation of O.C.G.A. § 40-6-391(a)(5) based on Wisdom's observations during Defendant's performance of the field sobriety tests and Defendant's failure to make a complete seal on the breathing tube during the preliminary breath test. The plain language of O.C.G.A. § 40-5-67.1(b) establishes that a suspect is not advised of the Georgia law requirements until he actually is arrested for violation of O.C.G.A. § 40-6-391. Defendant was not arrested until *after* he, in Wisdom's judgment, failed the field sobriety tests and preliminary breath test. Thus, the protections provided by the

consent law, whether Georgia or federal[4], were not implicated at the time Defendant was performing the field sobriety tests or submitted to the preliminary breath test.

## B. Miranda Warnings

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966). Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id.

Under federal law, the privilege against self-incrimination is a "bar against compelling communications or testimony, but that compulsion which makes a suspect or accused the source of real or physical evidence does not violate [the privilege]." Schmerber v. California, 384 U.S. 757, 764, 86 S. Ct. 1826, 1832, 16 L. Ed. 2d 908 (1966)(internal quotations and citations omitted). Although the facts of Schmerber involved the taking of a defendant's blood to determine intoxication, the principles underlying the Court's decision in that case are no less applicable to the administering of breath tests. See Pennsylvania v. Muniz, 496 U.S. 582, 597, 110 S. Ct. 2638, 2648, 110 L. Ed. 2d 528 (1990) (reasoning that submitting to a breath test does not require a

---

[4] Both consent notices have been included to reveal how similar these statutes are.

suspect to communicate any assertion of fact or belief and is therefore not testimonial in nature and not subject to Miranda's protections).

This portion[5] of Defendant's Motion is without merit. Any questions which may have been posed to Defendant were asked when Defendant was merely detained, not in custody. See Berkemer v. McCarthy, 468 U.S. 420, 442, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984) (stating that a motorist stopped for routine motor violation and asked moderate number of questions is not in custody). In this case, Defendant has been charged with violating O.C.G.A. §§ 40-6-391(a)(5) and 40-6-253 and 18 U.S.C. §§ 7 and 13. Sergeant Wisdom asked Defendant to perform three (3) field sobriety tests and to submit to a preliminary breath test, and he arrested Defendant based on the results of these tests. After this, Defendant was taken to security headquarters, where he submitted to two (2) additional breath tests. These additional breath tests were not testimonial in nature; therefore, the results of these breath tests are admissible despite Sergeant Wisdom's failure to read Defendant his Miranda warnings.

Defendant's Motion to Suppress is **DENIED**.

**SO ORDERED**, this 24th day of September, 2008.

JAMES E. GRAHAM
UNITED STATES MAGISTRATE JUDGE

---

[5] Defendant mentions Miranda merely in passing, but the undersigned has addressed this allegation out of an abundance of caution.